# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-2445

_____

United States of America, ex rel.

*Plaintiff - Appellee*

Paul Cairns; Terry Cleaver, M.D.; Kyle Colle, M.D.; Paul Tolentino, M.D.; Kevin Vaught, M.D.; Daniel Henson, Relators; Barbara Gibbs, Personal Representative of the Estate of Scott Randall Gibbs, M.D.

*Relators - Appellees*

v.

D.S. Medical LLC; Midwest Family Care, LLC

*Defendant*s

Midwest Neurosurgeons, LLC

*Defendant - Appellant*

Mount Auburn Medical Group, LLC, doing business as Mount Auburn Aesthetics Group

*Defendant*

Sonjay Fonn, M.D.

*Defendant - Appellant*

Deborah Seeger

*Defendant*

_____

No. 20-2448
_____

United States of America, ex rel.

*Plaintiff - Appellee*

Paul Cairns; Terry Cleaver, M.D.; Kyle Colle, M.D.; Paul Tolentino, M.D.; Kevin Vaught, M.D.; Daniel Henson, Relators; Barbara Gibbs, Personal Representative of the Estate of Scott Randall Gibbs, M.D.

*Relators - Appellees*

v.

D.S. Medical LLC

*Defendant - Appellant*

Midwest Family Care, LLC; Midwest Neurosurgeons, LLC; Mount Auburn Medical Group, LLC, doing business as Mount Auburn Aesthetics Group; Sonjay Fonn, M.D.

*Defendant*s

Deborah Seeger

*Defendant - Appellant*
_____

No. 20-3009
_____

United States of America, ex rel.

*Plaintiff – Appellee*

-2-

Paul Cairns; Terry Cleaver, M.D.; Kyle Colle, M.D.; Paul Tolentino, M.D.; Kevin Vaught, M.D.; Daniel Henson, Relators; Barbara Gibbs, Personal Representative of the Estate of Scott Randall Gibbs, M.D.

*Relators - Appellees*

v.

D.S. Medical LLC; Midwest Family Care, LLC

*Defendant*s

Midwest Neurosurgeons, LLC

*Defendant - Appellant*

Mount Auburn Medical Group, LLC, doing business as Mount Auburn Aesthetics Group

*Defendant*

Sonjay Fonn, M.D.

*Defendant - Appellant*

Deborah Seeger

*Defendant*

_____

No. 20-3010

_____

United States of America, ex rel.

*Plaintiff - Appellee*

-3-

Paul Cairns; Terry Cleaver, M.D.; Kyle Colle, M.D.; Paul Tolentino, M.D.; Kevin Vaught, M.D.; Daniel Henson, Relators; Barbara Gibbs, Personal Representative of the Estate of Scott Randall Gibbs, M.D.

*Relators - Appellees*

v.

D.S. Medical LLC

*Defendant - Appellant*

Midwest Family Care, LLC; Midwest Neurosurgeons, LLC; Mount Auburn Medical Group, LLC, doing business as Mount Auburn Aesthetics Group; Sonjay Fonn, M.D.

*Defendant*s

Deborah Seeger

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau
_____

Submitted: December 14, 2021
Re-submitted: January 19, 2022
Filed: July 26, 2022
_____

Before LOKEN, ARNOLD, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

There are several ways to prove that a claim is "false or fraudulent" under the False Claims Act. 31 U.S.C. § 3729(a)(1). One of them is to show that it "includes

items or services *resulting from* a violation" of the anti-kickback statute. 42 U.S.C. § 1320a-7b(g) (emphasis added). This case requires us to determine what the words "resulting from" mean. We conclude that it creates a but-for causal requirement between an anti-kickback violation and the "items or services" included in the claim. *See Burrage v. United States*, 571 U.S. 204, 210–11 (2014). The district court did not instruct the jury along these lines, so we reverse and remand for a new trial.

I.

Sonjay Fonn is a neurosurgeon in Cape Girardeau, Missouri. To treat degenerative-disc disease and other spinal disorders, he uses spinal implants. The implants, which stabilize the spine, are made by multiple manufacturers. Deciding which to use has important economic consequences for implant distributors, who earn hefty commissions with every sale. This puts Dr. Fonn and his practice, Midwest Neurosurgeons, in a powerful position.

Dr. Fonn chose to use implants distributed by DS Medical, a company wholly owned by his fiancée, Deborah Seeger. The arrangement was lucrative, even though Dr. Fonn was her only large customer. In just a single year, she made $1.3 million in commissions from one manufacturer alone. For his part, Dr. Fonn received an offer to purchase company stock from the same manufacturer. Once the sale went through, he ordered more implants.

Physicians in other practices grew suspicious of Dr. Fonn's high implant use, not to mention his cozy financial relationship with Seeger. They filed complaints against him, Midwest Neurosurgeons, Seeger, and DS Medical under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and other laws. The United States then intervened and filed its own complaint. *See* 31 U.S.C. § 3730(a), (b)(2), (b)(4) (providing that the government may intervene and conduct the litigation).

The complaint consisted of five claims. The first three, which arose under the False Claims Act, alleged that the couple and their businesses submitted false or

fraudulent Medicare and Medicaid claims after violating the anti-kickback statute, 42 U.S.C. § 1320a-7b(b), (g). The last two claims, which were equitable in nature, alleged unjust enrichment and payment under a mistake of fact.

A jury heard the first three claims. After each side presented its case, the district court instructed the jury that the government could establish falsity or fraud once it proved, by a preponderance of the evidence, "that the [Medicare or Medicaid] claim failed to disclose the [a]nti-[k]ickback [s]tatute violation." The jury returned a verdict for the government on two of the three claims. The district court then awarded treble damages and statutory penalties in the amount of $5,495,931.22.

Following the verdict, the government moved to dismiss its two remaining claims without prejudice, *see* Fed. R. Civ. P. 41(a)(2), on the ground that any recovery would be "smaller and duplicative of what the [c]ourt ha[d] already awarded." Unfortunately, the district court "inadvertently failed to rule on the government's motion" before the defendants filed an appeal, so we remanded. The government got its wish the second time around—a dismissal without prejudice— and the defendants have appealed again.

II.

The without-prejudice dismissal of the two equitable claims requires a closer look at our jurisdiction. As relevant here, we have appellate jurisdiction over "final decisions of the district courts." 28 U.S.C. § 1291. A "final decision" is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). To determine whether a decision is final, we look for "some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as the court is concerned, is the end of the case." *Goodwin v. United States*, 67 F.3d 149, 151 (8th Cir. 1995) (quotation marks and brackets omitted).

-6-

The odd procedural posture complicates things. On remand, the district court dismissed the government's equitable claims, but it did so without prejudice, and the government has expressed a clear intent to revive them if we reverse. Ordinarily, "a dismissal without prejudice, coupled with the intent to refile the voluntarily dismissed claims after an appeal of the interlocutory order, is a clear evasion of the judicial and statutory limits on appellate jurisdiction." *Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 688 (8th Cir. 1999); *see also Riis v. Shaver*, 4 F.4th 701, 705 (8th Cir. 2021) ("A dismissal without prejudice leaves the parties free to litigate as though the action never commenced." (quotation marks and ellipsis omitted)). Among other things, it creates a real risk of piecemeal adjudication. *See McLish v. Roff*, 141 U.S. 661, 665–66 (1891).

Not so here. The treble-damages award fully compensated the government for its injuries and then some, leaving no doubt that awarding anything more would lead to a duplicative recovery. *See Adams v. Toyota Motor Corp.*, 867 F.3d 903, 921 (8th Cir. 2017) (discussing double recoveries). Even if the dismissal without prejudice left the government with the ability to revive its equitable claims, deciding them on the merits would have been an "academic exercise," one without any real consequence for the parties. *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 505 F. Supp. 2d 20, 24 (D.D.C. 2007) (noting that "any recovery under" these circumstances "would be duplicative"); *see also United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 284 (5th Cir. 2020) ("We need not consider defendants' challenges to the $10.6 million judgment [on the equitable claims]. That's because it is subsumed within the second judgment for $30.6 million under the False Claims Act" and consequently "moot."). Under these circumstances, with no reason to decide what remained, dismissing without prejudice was, as "far as the court [was] concerned, . . . the end of the case," which is all that is necessary to satisfy the final-judgment rule. *Goodwin*, 67 F.3d at 151 (quotation marks and brackets omitted).[1]

---

[1]We dismiss the earlier appeals, filed before the district court dismissed the equitable claims without prejudice, as premature.

III.

Satisfied that appellate jurisdiction exists, we now turn to the merits. The couple argues that we must reverse the jury verdict because of two instructional errors. The first is the lack of a beyond-a-reasonable-doubt instruction, allegedly necessary here because the government relied on a criminal statute to prove its case. The second is the lack of an instruction on but-for causation. Reviewing these questions of statutory interpretation de novo, *see United States v. Carlson*, 787 F.3d 939, 944 (8th Cir. 2015), we conclude that the district court was right on the first point but wrong on the second.

A.

This case involves two statutes. The first is the False Claims Act, which imposes civil liability on anyone who presents or conspires to "present[] . . . a false or fraudulent claim" to the government. 31 U.S.C. § 3729(a)(1)(A), (C).

One way to prove that a claim is "false or fraudulent" is through a second law, the anti-kickback statute, which imposes criminal liability on anyone who solicits or receives illegal kickbacks for any "item[s] or service[s]" paid "in whole or in part" by Medicare or Medicaid. 42 U.S.C. § 1320a-7b(b)(1), (f), (g). Under a 2010 amendment, submitting a claim to the government that "includes items or services *resulting from* a[n] [anti-kickback] violation" makes a claim "false or fraudulent" under the False Claims Act. *Id.* § 1320a-7b(g) (emphasis added).

The government relied exclusively on the 2010 amendment to prove that Dr. Fonn, Seeger, and their businesses submitted "false or fraudulent claim[s]." 31 U.S.C. § 3729(a)(1)(A), (C). According to the government, the kickbacks "tainted" their choice of implants, so their claims for reimbursement through Medicare and Medicaid were "false or fraudulent." As the government puts it, it "pays only for conflict-free care."

-8-

B.

With that statutory background in mind, we start with what the district court got right: the burden of proof. The False Claims Act requires "the United States . . . to prove *all* essential elements of the cause of action . . . by a preponderance of the evidence." 31 U.S.C. § 3731(d) (emphasis added). All means all, not some or most. *See Webster's Third New International Dictionary* 54 (2002) (defining "all" as "the whole amount or quantity of" and "every member or individual component of"); *The American Heritage Dictionary of the English Language* 45 (5th ed. 2016) (defining "all" as "[b]eing or representing the entire or total number, amount, or quantity").

It makes no difference that the government's theory depended on proving an anti-kickback violation—itself a criminal act. *See* 42 U.S.C. § 1320a-7b(b) (providing criminal penalties for taking illegal kickbacks). As the Supreme Court has explained, "conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 (1985) (discussing this "general principle," which is found in "a number of settings").

The fact that the False Claims Act expressly provides a preponderance-of-the-evidence standard for all "essential elements" leaves no doubt that this "general principle" applies here. *Id.* Just as a plaintiff in a civil-racketeering case may establish an underlying criminal violation by a preponderance of the evidence, *see Bieter Co. v. Blomquist*, 987 F.2d 1319, 1320, 1324 (8th Cir. 1993), so too may the government establish an illegal kickback by a preponderance of the evidence as part of a larger False Claims Act case.

C.

Now on to what the district court got wrong: causation. The jury instruction said "it is enough for the United States to show that the claim failed to disclose the

-9-

[a]nti-[k]ickback [s]tatute violation." This instruction, which brushed aside causation, misinterpreted the 2010 amendment. *See* 42 U.S.C. § 1320a-7b(g).

1.

When a statute is unambiguous, interpretation both begins and ends with the text. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). The 2010 amendment says that "a claim that includes items or services *resulting from* a violation of this section [of the anti-kickback statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g) (emphasis added). This case turns on two simple words: "resulting from." With no statutory definition available, "we turn to the phrase's plain meaning at the time of enactment." *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020).

The Supreme Court undertook this task in interpreting a nearly identical phrase, "results from," in the Controlled Substances Act. *See Burrage v. United States*, 571 U.S. 204, 210–11 (2014). The statute in question specified an enhanced sentence whenever "death or serious bodily injury *results from* the use of [a distributed controlled] substance." 21 U.S.C. § 841(b)(1)(A)–(C) (emphasis added); *see Burrage*, 571 U.S. at 209. Looking to dictionary definitions, the Court concluded that the ordinary meaning of "'results from' imposes . . . a requirement of actual causality": the use of drugs had to be a "but-for cause of the death." *Burrage*, 571 U.S. at 210–11, 219 (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) ("This ancient and simple 'but for' common law causation test, we have held, supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated . . . ." (citation omitted)).

The context here may be different, but our conclusion is the same. "Resulting," which is the present-participle form of the verb, has the same meaning as its present-tense cousin, "results." *See The American Heritage Dictionary of the English Language* 1497 (5th ed. 2016) (defining "result," "results," and "resulting"

-10-

as "[t]o happen as a consequence" or "[s]omething that follows naturally from a particular action, operation, or course; a consequence or outcome"); *Webster's Third New International Dictionary* 1937 (2002) (defining "result," "results," and "resulting" as "to proceed, spring, or arise as a consequence, effect, or conclusion," and noting that all three words are often used with "from"). So we have little trouble concluding that, in common and ordinary usage, the participle phrase "resulting from" also expresses "a but-for causal relationship." *See Burrage*, 571 U.S. at 213 (quoting *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 63 (2007)).

*Burrage* also explains what "a but-for causal relationship" requires. *Id.* "'In the usual course,' [it] requires proof 'that the harm would not have occurred in the absence of—that is, *but for*—the defendant's conduct.'" *Id.* at 211 (emphasis added) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)). "It is . . . textbook tort law that an action 'is not regarded as a cause of an event if the particular event would have occurred without it.'" *Nassar*, 570 U.S. at 347 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 265 (5th ed. 1984) (defining but-for causation)). Tracking the textbook definition, the government had to prove here that the defendants would not have included particular "items or services" absent the illegal kickbacks. 42 U.S.C. § 1320a-7b(g); *see also Burrage*, 571 U.S. at 211.

Backed up against a wall of precedent, the government urges us to adopt an "alternative causal standard[]." *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (explaining that "the availability of alternative causal standards where circumstances warrant is, no less than the but-for test itself as a default, part of the background legal tradition against which Congress has legislated").[2] In its view, all that is required is that the illegal kickbacks "tainted" the "claim[] for goods or services" or the anti-kickback "violation itself *may* have been a contributing factor." Appellee's Br. at 29 (emphasis added).

---

[2]The government unsuccessfully made this same argument in *Burrage*. *See* Brief for the United States at 19, *Burrage*, 571 U.S. 204 (No. 12-7515), 2013 WL 5461835, at *19.

-11-

These alternative standards, however, are hardly causal at all. A "taint" could occur without the illegal kickbacks motivating the inclusion of *any* of the "items or services." Similarly, asking the jury if a violation "*may* have been a contributing factor" does not establish anything more than a mere possibility. And the district court's instruction may have been the least causal of all: just because a claim fails to disclose an anti-kickback violation does not mean that there is a connection between the violation and the included "items or services." 42 U.S.C. § 1320a-7b(g). Causation is an "essential element[]" that must be proven, not presumed. 31 U.S.C. § 3731(d).

Our holding here should be no surprise. After all, "[w]here there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality." *Burrage*, 571 U.S. at 212; *Comcast Corp.*, 140 S. Ct. at 1014 (calling it the "default" or background" rule against which Congress legislates). With nothing in the text of the 2010 amendment giving us reason to conclude otherwise, we follow *Burrage*'s example.

2.

Without any "*textual . . .* indication[s] to the contrary," the government resorts to two "*contextual* indication[s]." *See Burrage*, 571 U.S. at 212 (emphases added). Neither, however, overcomes the statute's plain language.

a.

The first "contextual indication" is that some pre-2010 cases had concluded that the non-disclosure of an anti-kickback violation was enough to make a claim "false or fraudulent" regardless of whether a causal relationship existed. Mirroring the government's "taint" argument, those courts reasoned that "compliance with federal health care laws, including the [anti-kickback statute], is a condition of payment by" Medicare or Medicaid. *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). Under that reasoning, *any*

-12-

failure to disclose an anti-kickback violation—regardless of the relationship between the illegal kickbacks and the items or services included—was sufficient. *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313 (3d Cir. 2011) (holding that plaintiffs "need not allege a relationship between the alleged [anti-kickback] violations and the claims . . . submitted to the Government"), *abrogated on other grounds by Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016). The government argues that the 2010 amendment "simply codified" these holdings.

We disagree, if for no other reason than the text of the 2010 amendment says otherwise. *See Food Mktg. Inst.*, 139 S. Ct. at 2364 (explaining that when the "ordinary meaning and structure" of the law "yields a clear answer, judges must stop"). The phrase "resulting from," as we have already explained, is unambiguously causal. *See Burrage*, 571 U.S. at 211–13. If Congress wanted to "codify" the pre-2010 cases, it could have selected different language. The government's list of "alternative causal standards" provides several examples, including "tainted by" or "provided in violation of." *Cf. id.* at 216 ("Congress could have . . . adopted a modified causation test tailored to cases involving concurrent causes, as five States have done."). Although the government might have preferred one of these other alternatives, it is our job to interpret Congress's actual words. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018).

b.

The second indication, characterized by the government as "contextual," is legislative history. Looking beyond the text of the 2010 amendment, the government relies on the floor statements of two of its sponsors to argue that its purpose was to expand the universe of claims that are "false or fraudulent" under the False Claims Act. 31 U.S.C. § 3729(a)(1).

Starting with legislative history and purpose, however, is no way to read a statute. *See Food Mktg. Inst.*, 139 S. Ct. at 2364; *United States v. Trans-Missouri*

*Freight Ass'n*, 166 U.S. 290, 318 (1897) ("[D]ebates in [C]ongress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body."). After all, when a statute is unambiguous, we start and end in the same place: with the words of the statute itself. *See id.*; *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862 (8th Cir. 2011). The reason is simple: our duty is to "interpret laws," not "reconstruct legislators' intentions." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 452–53 (1987) (Scalia, J., concurring in the judgment); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("[L]egislative history is not the law.").

We recognize that the Third Circuit came out differently in *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89 (3d Cir. 2018). Although we understand its point of view, it adopted an approach that we have already rejected: relying on legislative history and "the drafters' intentions" to interpret the statute. *Id.* at 96.

\* \* \*

Our ruling today is narrow. We do not suggest that every case arising under the False Claims Act requires a showing of but-for causation. Rather, when a plaintiff seeks to establish falsity or fraud through the 2010 amendment, it must prove that a defendant would not have included particular "items or services" but for the illegal kickbacks. 42 U.S.C. § 1320a-7b(g). Here, given that the government's sole theory at trial hinged on the 2010 amendment, the district court never instructed the jury on but-for causation, and there is no telling what the jury would have done if it had, we remand for a new trial.[3]

---

[3]Although the defendants argue in passing that we should just enter judgment in their favor, the government presented enough evidence on the "essential elements" of the claim, including causation, to receive a new trial. 31 U.S.C. § 3731(d); *cf. Schumacher v. Cargill Meat Sols. Corp.*, 515 F.3d 867, 872 (8th Cir. 2008) (denying a new trial because the plaintiffs had not produced any evidence of intent the first time around).

## IV.

We accordingly reverse the judgment of the district court and remand for further proceedings.

_____